UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

RAYMOND GENE PHENIX,

Petitioner,

v.

JAMES SCHOMIG, et al.,

Respondents.

Case No. 2:03-cv-00485-MMD-NJK

ORDER

## I.    SUMMARY

Before the Court are the fourth amended petition for a writ of habeas corpus, respondents' answer with exhibits (dkt. no. 154), and petitioner's amended reply (dkt. no. 159).  The Court finds that relief is not warranted, and the Court denies the fourth amended petition.

## II.    FACTS AND PROCEDURAL HISTORY

Petitioner Raymond Gene Phenix challenges his 1995 Nevada state conviction of first-degree murder in connection with the death of his wife, Doreen Phenix.  Petitioner is serving a sentence of life imprisonment without the possibility of parole, plus an equal and consecutive sentence for the use of a deadly weapon.

Doreen Phenix was petitioner's wife.  She worked at the Emperor's Room, a Chinese restaurant inside the Lady Luck casino in downtown Las Vegas.  On November 14, 1991, she parked her car in the Las Vegas City Hall's public parking lot that was across the street from the Lady Luck.  That night, she was stabbed to death in her car between 11:00 p.m. and 11:15 p.m.  Petitioner and a friend, Robert Schaefer, reported finding her body to the police around 10:00 a.m. on November 15, 1991.

Petitioner maintained that he was at the Showboat casino's bingo room at the time that Mrs. Phenix was killed. His alibi had several problems. First, witnesses who were at the Showboat could not confirm unequivocally that they saw petitioner at the Showboat between 10:50 p.m. and 11:30 p.m.[1] The Showboat casino was on East Fremont Street, southeast of downtown Las Vegas. Petitioner often parked in a parking lot for a Montgomery Ward department store that was across Fremont Street because it was more convenient for access to the bingo room. Testimony at trial indicated that a person could leave the Showboat, drive to the downtown parking lot, and return to the Showboat in the time that nobody saw petitioner at the Showboat.

Second, the investigation of Mrs. Phenix's car found blood spatter on the inside of the windshield and with a sun screen placed behind the windshield. The only way that the blood could have been deposited on the inside of the windshield was if the sun screen was placed behind the windshield after Mrs. Phenix was killed. The sun screen itself had blood stains indicating that a person with bloody hands put it into place.

Third, Julie Chen,[2] a co-worker and friend of Mrs. Phenix, testified that Mrs. Phenix left work at 11:00 p.m. Chen further testified that she left work herself at 11:10 p.m. She had parked her car near Mrs. Phenix's car in the same parking lot. Chen arrived at the parking lot around 11:15 p.m. Chen noticed that Mrs. Phenix's car was still in the lot. She also noticed that a sun screen was behind the windshield. Chen did not remember the sun screen being up earlier in the day when she arrived for work, and

---

[1]Margaret Bost provided at best a weak alibi for petitioner. She was a cocktail waitress on duty in the Showboat's bingo room that night. The Showboat had bingo sessions that started every two hours on the odd-numbered hours. She testified that petitioner approached her for a drink at a time that, based upon her normal practice, could only have occurred after bingo started at 11:00 p.m. However, that testimony was inconsistent with her prior statements and her testimony at the first trial. She admitted on cross-examination that she could not recall whether petitioner approached her at the beginning of the session or at the end of the session. She could not even recall whether it actually was the 11:00 p.m. session. Ex. A, at 2894, 2906-07 (dkt. no. 154).

The sufficiency of the evidence used to convict petitioner is not at issue in the fourth amended petition.

[2]Her given name is Yew Chen or Yew Chin, which appears in some documents in the record.

November 14, 1991, was cloudy and rainy.  Chen saw a truck drive close to Mrs. Phenix's car.  She recognized the truck as petitioner's truck.  Chen saw petitioner get out of the truck.  Petitioner walked around the back of the car and looked inside the passenger-side window.  Petitioner walked around the back of the car again, opened the driver-side door, and closed it.  Chen then drove away, thinking at the time that nothing was amiss. Ex. A, at 1243-53 (dkt. no. 154).  Given that the sun screen was placed behind the windshield after Mrs. Phenix was killed, Mrs. Phenix must have been dead when Chen witnessed petitioner's actions.

Fourth, petitioner told different groups of people inconsistent plans for the night of November 14, 1991.  Witnesses who were at the Showboat testified that petitioner told them that he was waiting for Mrs. Phenix to arrive at the Showboat so they could play bingo and eat dinner.  Witnesses who spoke with Mrs. Phenix that evening related different plans.  Susanne Lesniak, a friend of Mrs. Phenix, testified that Mrs. Phenix said earlier in the day that petitioner had told her to leave work right at 11:00 p.m. and to come straight home for a surprise.  Ex. A, at 1078, 1088-89 (dkt. no. 154).  Susanna Ho, a co-worker at the Lady Luck, heard Mrs. Phenix say to her husband on the phone that she would wait for him at the parking lot at 11:00 p.m.  *Id.*, at 1127-28.  Martha Jackson, another co-worker, testified to the same.  *Id.*, at 1172-73.  Julie Chen testified that petitioner called Mrs. Phenix at 10:30 p.m.  Mrs. Phenix said that petitioner had a surprise waiting for her in the parking lot.  *Id.*, at 1231.[3]

Fifth, petitioner tried to bribe a friend into giving a false alibi.  Petitioner was arrested and charged with Mrs. Phenix's murder in February 1992, but he was placed on bail.  Starting in December 1992, he met with Robert Curell.  Curell testified that

---

[3]Lesniak's testimony about what Mrs. Phenix said petitioner told her is inconsistent with what other witnesses at the Lady Luck testified that Mrs. Phenix said that petitioner told her.  However, the theme of all the Lady Luck witnesses was that petitioner told Mrs. Phenix to leave immediately after work, either for home or for a surprise in the parking lot, implying that petitioner would be at either of those locations.  That was inconsistent with the Showboat witnesses who testified that petitioner told them that he was waiting for Mrs. Phenix to get off work and to join him at the Showboat.

petitioner told him that he had a gap in his Showboat alibi and that a witness had seen petitioner in the downtown parking lot.  Petitioner asked Curell to provide him with a false alibi:  Curell would testify that he saw petitioner in the Showboat during that gap in time when nobody actually did see petitioner at the Showboat.  Curell eventually went to the police.  After two meetings between Curell and petitioner, police arrested petitioner for attempting to bribe a witness.  This time, he was jailed.

Sixth, while in jail petitioner tried to hire his cellmate to keep Chen and Curell from testifying at trial and to procure three people who could provide false alibis that petitioner was at the Showboat.  Petitioner drew a diagram of the Showboat's bingo room so that these putative alibi witnesses could prepare their testimony, and petitioner gave the diagram to the cellmate.  The cellmate went to the police with this information and the diagram.

Other witnesses testified about petitioner's behavior after Mrs. Phenix was killed.  Those witnesses' testimonies mostly are not relevant to the grounds in the fourth amended petition.  The one exception is a meeting that petitioner had with Michelle Pro, the human relations supervisor at the Lady Luck.  Pro recorded the conversation, but the recording was lost.  The loss of the recording is one of the subjects of ground 1(C).

The case first went to trial in May 1994.  The jury could not reach a verdict, and the trial court declared a mistrial.  The second trial was held in February-March 1995.  The jury found petitioner guilty of first-degree murder with the use of a deadly weapon.  The jury set the sentence at life imprisonment without the possibility of parole, plus an equal and consecutive sentence for the use of a deadly weapon.  Petitioner appealed, and the Nevada Supreme Court affirmed.  *Phenix v. State*, 954 P.3d 739 (Nev. 1998).[4]

Petitioner then filed a post-conviction habeas corpus petition in the state district court.  Exh. F (dkt. no. 154).  The state district court denied the petition.  Exh. G (dkt.

---

[4]Respondents filed a copy of the advance-sheet opinion as Exhibit E (dkt. no. 154), but that copy is missing a page.  Therefore, the court will refer to the published opinion.

no. 154).  Petitioner filed a motion for relief from that judgment.  Exh. H (dkt. no. 154).  The state district court construed the motion as a successive petition and denied it pursuant to Nev. Rev. Stat. § 34.810.  Exh. I (dkt. no. 154).  Petitioner appealed both of those orders and a third order denying his motion for discovery.  The Nevada Supreme Court affirmed both post-conviction orders and dismissed the appeal about the discovery motion because it lacked jurisdiction.  Exh. J (dkt. no. 154).

Petitioner then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in *Phenix v. Grigas*, 2:01-cv-00562-LDG-PAL.  Exh. K (dkt. no. 154).  This Court dismissed the petition because petitioner had not exhausted all his available grounds for relief.  Exh. M (dkt. no. 154).

Petitioner returned to state court with two more post-conviction petitions.  Ultimately, the Nevada Supreme Court determined that both petitions were successive pursuant to Nev. Rev. Stat. § 34.810 and untimely pursuant to Nev. Rev. Stat. § 34.726.  Exh. S, Exh. V (dkt. no. 154).

While the appeal that led to the Nevada Supreme Court's January 27, 2004 Order of Affirmance (dkt. no. 154, Exh. V) was pending, petitioner commenced the current action in this Court.  Petitioner styled the first petition that he filed in this action as a first amended petition (dkt. no. 1); consequently, the numbering of all the petitions is inaccurate.  The Court dismissed some grounds of the second amended petition (dkt. no. 17) as procedurally defaulted.  Order (dkt. no. 42).  The current operative petition is styled as the fourth amended petition.

## III.    STANDARD OF REVIEW

Congress has through the Antiterrorism and Effective Death Penalty Act (AEDPA) limited the circumstances in which a federal court can grant relief to a petitioner who is in custody pursuant to a judgment of conviction of a state court.  The AEDPA imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under this highly

deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect.   131 S.Ct. at 1411.  28 U.S.C. § 2254(d) provides that

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

> Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of this Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

*Richter,* 131 S. Ct. at 785.  "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Id.* (citation omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (citation omitted).

> [E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

1  *Richter*, 131 S. Ct. at 786.

2
3  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.
4

5  *Id.*, at 786-87.

6  **IV.   GROUND 1**

7  Ground 1 contains claims of ineffective assistance of trial counsel.[5]  "[T]he right

8  to counsel is the right to the effective assistance of counsel."  *McMann v. Richardson,*

9  397 U.S. 759, 771 & n.14 (1970).  A petitioner claiming ineffective assistance of counsel

10  must demonstrate (1) that the defense attorney's representation "fell below an objective

11  standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and

12  (2) that the attorney's deficient performance prejudiced the defendant such that "there is

13  a reasonable probability that, but for counsel's unprofessional errors, the result of the

14  proceeding would have been different," *id.* at 694.  "[T]here is no reason for a court

15  deciding an ineffective assistance claim to approach the inquiry in the same order or

16  even to address both components of the inquiry if the defendant makes an insufficient

17  showing on one." *Id.* at 697.

18  *Strickland* expressly declines to articulate specific guidelines for attorney

19  performance beyond generalized duties, including the duty of loyalty, the duty to avoid

20  conflicts of interest, the duty to advocate the defendant's cause, and the duty to

21  communicate with the client over the course of the prosecution.  466 U.S. at 688.  The

22  Court avoided defining defense counsel's duties so exhaustively as to give rise to a

23  "checklist for judicial evaluation of attorney performance. . . .  Any such set of rules

24  would interfere with the constitutionally protected independence of counsel and restrict

25  the wide latitude counsel must have in making tactical decisions."  *Id.* at 688-89.

26  ///

27
28  [5]Two attorneys represented petitioner at trial.  The Court will refer to them collectively as counsel.

Review of an attorney's performance must be "highly deferential," and must adopt counsel's perspective at the time of the challenged conduct to avoid the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689.  A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

The Sixth Amendment does not guarantee effective counsel *per se*, but rather a fair proceeding with a reliable outcome.  *See Strickland*, 466 U.S. at 691-92.  *See also Jennings v. Woodford*, 290 F.3d 1006, 1012 (9th Cir. 2002).  Consequently, a demonstration that counsel fell below an objective standard of reasonableness alone is insufficient to warrant a finding of ineffective assistance.  The petitioner must also show that the attorney's sub-par performance prejudiced the defense.  *Strickland*, 466 U.S. at 691-92.  There must be a reasonable probability that, but for the attorney's challenged conduct, the result of the proceeding in question would have been different.  *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . and when the two apply in tandem, review is "doubly" so . . . . The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citations omitted).

In ground 1(A)(i), petitioner claims that counsel failed to interview personally seven witnesses:  Rene Trepanier, Lorene Miller, Eric Maynard, Margaret Bost, Leo DeIulio, E. Ramos, and Jerry Glosten.  These witnesses were relevant to petitioner's

///

attempt to establish an alibi that he was present at the Showboat at the time of Mrs. Phenix's murder.  On this issue, the Nevada Supreme Court held:

> Next, appellant contended that his counsel failed to personally interview seven witnesses.  We conclude that the district court did not err in denying this claim.  Appellant did not state what these interviews would have revealed.  Moreover, each of the seven witnesses testified at trial and appellant's counsel thoroughly cross-examined them. Therefore, appellant failed to provide sufficient facts in support of these claims that would entitle him to relief.

Exh. J, at 4-5 (dkt. no. 154).  The Nevada Supreme Court's statement of who testified is incorrect.  Miller, Maynard, DeIulio were prosecution witnesses, and Bost was a defense witness.  Trepanier died before trial.  Prior deposition testimony of Trepanier was read into the record in the defense case.  Exh. A, at 2846-57 (dkt. no. 154).  Ramos and Glosten did not testify at trial.  The Court will address Glosten in its discussion of ground 1(B)(i), below.  As for the other defendants, the Court agrees with the Nevada Supreme Court that petitioner has not alleged what information counsel could have obtained from personal interviews that counsel did not obtain through other means.  Counsel cross-examined Trepanier in the prior deposition.  At petitioner's second trial, counsel cross-examined Miller, Maynard, and DeIulio.  Counsel also directly examined Bost during the defense case.  Furthermore, counsel had the opportunity to examine all four of those witnesses in the first trial.  In effect, counsel did personally interview them before the second trial.  The Nevada Supreme Court's decision regarding these witnesses was a reasonable application of *Strickland.*

Ramos was a case of mistaken identity.  Petitioner had told the police that a Hispanic porter saw him at the Showboat.  Detective Dibble learned from a Showboat department manager that Ramos was scheduled for duty in the Showboat's bingo room that night.  Dibble interviewed Ramos, and Ramos told him that he did not remember seeing petitioner. Exh. A, at 2401-02 (dkt. no. 154).   Shortly before the first trial, everybody learned that Dibble had spoken to the wrong person.  Jose Rivera, the supervisor of the porters and the person who actually set the schedule, testified at the second trial that Ramos actually had not been on November 14, 1991, and that Alejos

Perez was the relief porter on duty in the bingo room.  Exh. A, at 1951-53 (dkt. no. 154).  Perez died before the first trial, and nobody interviewed him.[6]  Ramos, not being at the Showboat on November 14, 1991, had no relevant information.  Counsel would have learned nothing by interviewing Ramos. The Nevada Supreme Court's determination on this issue was a reasonable application of *Strickland*.

In ground 1(A)(ii), petitioner claims that counsel hired a private investigator two years after the murder of Mrs. Phenix, and the court rejected his investigations.  The Court agrees with respondents that petitioner did not present this claim to the state courts.  Nonetheless, the Court can deny the ground on its merits. 28 U.S.C. § 2254(b)(2).  Defense counsel wanted the investigator to testify about his observations of the procedures and locations of the Showboat's bingo room on February 13, 15, and 16, 1995.  The information was stale because the bingo room, and its procedures, had changed in the intervening time.  However, even if counsel hired the investigator earlier, right after petitioner was arrested in February 1992, and even if counsel immediately told the investigator to observe bingo at the Showboat, the investigator's findings still would not have been relevant evidence.  The relevant date was November 14, 1991, and the investigator was not at the Showboat on that evening.  Witnesses who were present that evening testified when they saw petitioner in relation to certain events in the bingo room, such as the start of the session or the start of a particular game.  Even if the Showboat bingo room followed the same procedures each night, it was no guarantee that a game would start at the same time each night or that a game would last the same amount of time each night.  The only relevant evidence could come from people who were in the bingo room on the night of November 14, 1991, and counsel could not send the investigator back to that night.  Consequently, counsel did not perform deficiently by instructing the investigator to make his observations when he did.  Ground 1(A)(ii) is without merit.

---

[6]The Court will discuss the lack of a statement from Perez in ground 1(C), below.

In ground 1(B)(i), petitioner claims that counsel provided ineffective assistance because counsel did not call Jerry Glosten to testify as an alibi witness.  On this issue, the Nevada Supreme Court held:

> Next, appellant contended that his counsel failed to subpoena or have testify a known "alibi" witness by the name of J. Glosten.  Based on documents attached to the petition, we conclude that the district court did not err in denying this claim because counsel's decision not to have J. Glosten testify at appellant's trial was a tactical decision of defense counsel.

Exh. J, at 3-4 (dkt. no. 154).  The first state habeas corpus petition is attached as Exhibit F to the answer (dkt. no. 154).  Exhibit J to that petition, not to be confused with the answer's Exhibit J, is the transcript of Glosten's interview with the police.  Glosten told the police that he first saw petitioner at the Showboat no earlier than 11:20 p.m. or 11:30 p.m.  Exhibit O to the first state habeas corpus petition is a letter from an investigator to petitioner's counsel.  The investigator relates his conversation with Glosten.  Glosten repeated what he told the police, that he first saw petitioner at the Showboat no earlier than 11:20 p.m. or 11:30 p.m.  The information that Glosten could have provided at trial was no different than the information that Eric Maynard actually did provide.  Maynard, a prosecution witness, testified that he first saw petitioner around 11:25 p.m. or 11:30 p.m.  Exh. A, at 1904-05 (dkt. no. 154).  Glosten could not have provided petitioner with an alibi, and his testimony would have further cemented the notion that nobody at the Showboat saw petitioner between 10:50 p.m. and 11:30 p.m.  The Nevada Supreme Court reasonably applied *Strickland* when it held that counsel's decision not to call Glosten was not ineffective assistance of counsel.

Grounds 1(B)(ii) and 1(D) are related; both concern a lucky ring that Mrs. Phenix carried in her purse.  In ground 1(B)(ii), petitioner claims that counsel failed to present to the jury evidence that somebody else had been arrested for pawning Mrs. Phenix's ring.  On this claim, the Nevada Supreme Court held:

> Next, appellant claimed that his counsel was ineffective for failing to present "best evidence."  It appears that appellant was claiming that his attorney failed to present appellant's alternative theories of the case.  Appellant did not support this claim with sufficient facts.

Exh. J, at 5 (dkt. no. 154).  In ground 1(D), petitioner claims that counsel failed to argue

that the police had not disclosed potentially exculpatory evidence — the identity of the

man arrested and the facts of the case — in violation of *Brady v. Maryland*, 373 U.S. 83

(1963).  On this claim, the Nevada Supreme Court held, in relevant part:

> Appellant's last claim of ineffective assistance of counsel was that his
> counsel failed to make various objections.  Specifically, appellant claimed
> that his counsel did not object to: . . . (2) possible *Brady* violations . . . .
> We conclude that the district court did not err in denying these claims.
> These claims are belied by the record on appeal.  Moreover, appellant
> failed to support these claims with sufficient factual allegations which, if
> true, would have entitled him to relief.

Exh. J, at 5 (dkt. no. 154) (footnotes omitted).

The Nevada Supreme Court was correct that petitioner did not support his claims

with any facts.  The claim equivalent to ground 1(B)(ii) was, in full:

> 6)    Trial counsel failed to present the "BEST EVIDENCE" . . .
>     (b)    Another man was arrested for pawning Doreen's lucky ring
>         usually carried in her purse which was missing from the
>         crime scene.

Exh. F, at 22 (supporting memorandum attached to state habeas corpus petition) (dkt.

no. 154).  The claim equivalent to ground 1(D) was, in full:

> 7)    Trial counsel failed to OBJECT and PRESERVE constitutional
>     violations. . . .
>     (b)    No objection to possible *Brady* violation: . . . .  No statement
>         or facts regarding the arrest of the man who pawned
>         Doreen's lucky ring.

*Id.* Petitioner also raised in his first state habeas corpus petition a *Brady* claim that was

procedurally defaulted.  It was, in full:

> No statement by the man arrested for pawning the victim's jewelry, or any
> discovery from that case file, handled by Det. Scholl.

*Id.* at 27.  This court's "review under § 2254(d)(1) is limited to the record that was before

the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 131 S. Ct.

1388, 1398 (2011).[7]  Claims of ineffective assistance of counsel require petitioner to

---

[7]Petitioner tried to present these claims in greater detail in a successive state habeas corpus petition.  *See* Exh. P (dkt. no. 154).  However, those details were not before the Nevada Supreme Court when the Nevada Supreme Court issued its decision on the merits.

The successive state petition was procedurally barred pursuant to Nev. Rev. Stat. § 34.810 and § 34.726 for being successive and untimely, respectively.  Exh. S (dkt. no. 154).

allege facts that show both deficient performance by counsel and prejudice suffered by petitioner.   Petitioner presented no facts to the state court in support of his claims. Consequently, the Nevada Supreme Court's rejections of these two claims were reasonable applications of *Strickland*.

Ground 1(C) is largely a claim that counsel failed to move to dismiss the prosecution because evidence was lost.  Petitioner includes in ground 1(C) a claim that counsel should have objected to a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The Court discusses that claim below.   As for the rest of ground 1(C), the Nevada Supreme Court held:

> First, appellant claimed that his counsel was ineffective because he failed to move for a dismissal of the case after learning that several pieces of exculpatory evidence were lost or mishandled. We conclude that the district court did not err in denying this claim. Appellant's counsel adequately and thoroughly cross-examined the pertinent witnesses regarding the lost or mishandled pieces of evidence.  Therefore, appellant failed to show that his counsel's performance fell below an objective standard of reasonableness or that he was prejudiced.

Ex. J, at 3 (dkt. no. 154).  "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  *Arizona v. Youngblood,* 488 U.S. 51, 58 (1988).  Petitioner complains about lost blood evidence, lost recordings of conversations, lost clothing, and lost photographs.  Counsel did cross-examine Terry Cook, a blood analyst, as to why he did not test blood found in Mrs. Phenix's car for two years.  Exh. A, at 2013-14 (dkt. no. 154).  Michelle Pro testified about a conversation that she had with petitioner after Mrs. Phenix's death.  She recorded the conversation, but the recording was lost.  Counsel cross-examined her about the tape.   *Id.* at 2079-80.  Counsel also cross-examined Detective Scholl about the loss of the tape; he had no recollection of ever receiving a tape from her.  *Id.* at 2821-22.  Robert Curell had two conversations with petitioner after Curell went to the police.  The conversation on January 25, 1993, was recorded.  The conversation on February 1, 1993, was not recorded.  On cross-examination, Detective Chandler testified that the microphone of the recording device had a short circuit, so

that while the machine was functioning, the tape did not record anything.  *Id.* at 2711.
Detective Dibble testified that he asked petitioner for all the clothes that petitioner was
wearing on the night Mrs. Phenix was murdered, and that while he received some
clothes, he never received the shirt that petitioner was wearing.  On cross-examination,
Detective Dibble testified that the matter essentially fell through the cracks because
petitioner left for Singapore, Mrs. Phenix's homeland, after the request, and a constant
flow of new cases essentially shoved the memory of the request out of Dibble's mind.
*Id.* at 2375-76, 2393.  Detective Scholl ordered that photographs be taken of the exterior
of petitioner's truck shortly after Mrs. Phenix's murder, no later than November 16,
1991.  Scholl was present for at least the start of the photography session, but he did
not remember who the photographer was.  The photographs never made it into the file,
and on cross-examination Scholl expressed surprise at that.  *Id.* at 2816-21.  In none of
these instances did counsel uncover any evidence of bad faith by the police.
Consequently, there was no basis for a motion to dismiss.  Counsel did demonstrate
that the investigation might have been sloppy, but that was an argument that he needed
to present to the jury.  The Nevada Supreme Court's determination was a reasonable
application of *Strickland* on these matters.

The last claim of lost evidence in ground 1(C) concerns the loss of any statement
by Alejos Perez, the porter who actually was on duty in the Showboat's bingo room on
the night of November 14, 1991. As the Court has noted above in its discussion of
ground 1(A)(i), the police interviewed the wrong porter, and nobody recognized the error
until just before the first trial and after Perez had died.  Just as with the other pieces of
lost evidence, counsel cross-examined both Detective Dibble and Rivera, the supervisor
of the porters, about the mistaken identity.  Exh. A, at 1951-53, 2401-02 (dkt. no. 154).
Counsel did not discover any evidence of bad faith by the police, and there was no

///

///

///

basis for a motion to dismiss.  The Nevada Supreme Court's determination on this matter was a reasonable application of *Strickland*.[8]

Petitioner also complains in ground 1(C) that counsel did not move to dismiss because petitioner was not given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), before Detective Scholl interviewed him on November 20, 1991.  Petitioner was not in custody at the time of that interview.  Detective Scholl did not need to advise petitioner about his rights.  A motion to dismiss based upon *Miranda* would have failed, and counsel did not provide ineffective assistance by not raising the motion.

Reasonable jurists would not find these conclusions to be debatable or wrong, and the Court will not issue a certificate of appealability for ground 1.

## V.      GROUND 2

In ground 2, petitioner claims that his appellate counsel provided ineffective assistance for two reasons.  In ground 2(A), petitioner claims that appellate counsel failed to raise the issue of lost evidence, discussed in ground 1(C).  In ground 2(B), petitioner claims that appellate counsel failed to raise a possible violation of the Confrontation Clause of the Sixth Amendment because Ramos, the porter whom Detective Dibble interviewed, did not testify.  On these issues, the Nevada Supreme Court held:

> We conclude that the district court did not err in denying these claims. Appellant failed to demonstrate that his counsel acted unreasonably or that he was prejudiced by appellate counsel's performance.  Furthermore, appellate counsel is not required to raise every non-frivolous issue on appeal and is most effective when every conceivable issue is not raised on direct appeal.

Exh. J, at 6 (*citing*, among other authorities, *Strickland* and *Jones v. Barnes*, 463 U.S. 745 (1983).  The Court already has determined above that the Nevada Supreme Court's

---

[8]Although nobody ever interviewed Perez, Rivera's testimony showed that Perez could not have given anybody any useful information.  Perez's lunchtime was between 10:40 p.m. and 11:20 p.m., and the Showboat's policy required Perez to go to the help hall for lunch.  The help hall was far away from the bingo room.  Exh. A, at 1949-50 (dkt. no. 154).  For the time that petitioner actually needed an alibi from Perez, Perez was in no position to see petitioner.

holding on the effectiveness of trial counsel regarding the lost evidence was a reasonable application of *Strickland*.  That determination applies with equal force to ground 2(A).  Trial counsel did not find any evidence of bad faith by the police in the loss of the evidence.  The issue, if raised on direct appeal, had little possibility of success.  Consequently, the Nevada Supreme Court reasonably could have determined that appellate counsel provided effective assistance in not raising the issue of lost evidence.

The Nevada Supreme Court's holding also was reasonable regarding appellate counsel's decision not to raise a Confrontation Clause claim. Detective Dibble interviewed the wrong person.  Ramos could not have provided any relevant evidence because Ramos was not working at the Showboat on the night of November 14, 1991. Petitioner argues that Ramos' testimony was essential because his statement to Dibble led Dibble to believe that petitioner was lying.  However, the relevant person who needed to be cross-examined was Dibble.  Defense counsel did that, showing the error in Dibble's basis for thinking that petitioner was lying.  However, by the time of the trial so much more evidence had been amassed against petitioner that it made little difference what Dibble thought at the start of the investigation.

Reasonable jurists would not find these conclusions to be debatable or wrong, and the Court will not issue a certificate of appealability for ground 2.

**VI.   GROUND 3**

Ground 3 is a claim of prosecutorial misconduct for admitting a recorded conversation between petitioner and Robert Curell, made on January 25, 1993. Petitioner had been trying to convince Curell to provide a false alibi since December 1992.  Curell eventually became disturbed enough that he went to the police.  Starting on January 22, 1993, Curell agreed to work as an informant for the police.  Curell met twice with petitioner after starting his work. The meeting on January 25, 1993, was recorded.  The meeting on February 1, 1993, was not recorded because of a short circuit, but it resulted in petitioner's arrest for attempting to bribe Curell.  A question

arose about which of petitioner's statements to Curell after his work for the police started could be admitted into the murder trial, because petitioner already had been charged with the murder of Mrs. Phenix and counsel represented him. The trial court issued orders. Neither party has provided copies of the orders. Petitioner's direct-appeal briefs refer to the orders. Exh. C, at 1-2, 3 (dkt. no. 154). The minutes of the trial court also have the essential details:

> Minutes
> 10/19/1993 10:00 AM
> -        Arguments by Mr. Terry and Mr. Harmon. Counsel stipulated that on 1/21/93 Deft. became an agent. COURT ORDERED, <u>any questions concerning the affair will be suppressed</u>; any statements made by Deft. while he was an agent that goes toward impeachment. COURT ORDERED, Motion denied as to those questions Further arguments. COURT ORDERED, any other statements made after 1/21/93 will be taken under advisement; matter continued for the Court's Decision. CUSTODY 10/26/93 at 8:45 AM for Court's Decision
>
> Minutes
> 10/26/1993 8:45 AM
> -        COURT ORDERED, Defendant's Motion to Suppress denied; <u>the statements made on the bribery investigation will not be suppressed; any statements made regarding Deft's. marriage to his wife will be suppressed</u>; matter set for a status check. Counsel advised case would take one week to try. Mr. Terry requested a Juror questionnaire. State concurred. Court advised both counsel to get together and prepare the questionnaire. CUSTODY 11/4/93 at 8:45 AM for Status Check

Exh. 1, at 5-6 (dkt. no. 27) (emphasis added).[9] The Court assumes that "the affair" in minutes of October 19, 1993, refers to the murder charge against petitioner, not an extramarital affair. During the first trial, the prosecution moved for reconsideration. The minutes show the following ruling:

> Minutes
> 05/17/1994 10:00 AM
> -        OUTSIDE PRESENCE OF JURY: State put on the record that the witness, Michael Goodman, was not endorsed on the Information but that he had discussed the matter with defense who had no objection to him testifying. Mr. Terry agreed. State advised the recorded conversation

---

[9]Respondents filed this exhibit in support of their motion to dismiss (dkt. no. 26). The volume of exhibits has not been imaged.

The minutes are available on-line in *State v. Phenix*, No. 92C107053, https://www.clarkcountycourts.us/Anonymous/CaseDetail.aspx?CaseID=7602368 (last visited July 11, 2013).

between witness, Michelle Pro and Deft., had not been found yet. Discussions concerning the Motion to Suppress and Motion to Reconsider. COURT ORDERED, <u>the conversation as to the affair prior to the time the witness was a police agent will be allowed into testimony; the conversation after becoming a police agent will not be allowed</u>. Mr. Terry requested the Court not allow certain statements to come into evidence from the written transcript of a particular conversation. Argument by Mr. Harmon. COURT ORDERED, as to attorney's fees, that part of the transcript will not be allowed in. JURY PRESENT: Further testimony. COURT ORDERED, matter CONTINUED to 5/18/94 at 10:00 AM. CUSTODY

*Id.*, at 16-17 (emphasis added). Again, the Court assumes that "the affair" refers to the murder charge against petitioner, not an extramarital affair. The Court does not possess the transcripts of any of these hearings, but petitioner alleged that his counsel asked if he could ask Curell about certain information while Curell was recording the meeting. The court's response was, "If you want to open the door, I want you to know, Mr. HARMON [the prosecutor] can pursue it too." Fourth Amended Petition, at 7.

The Sixth Amendment does not allow the prosecution to use at trial petitioner's self-incriminating statements that he made after he was arraigned on the charges at issue and that the prosecution obtained in secret in the absence of his counsel. *Massiah v. United States*, 377 U.S. 201, 205-06. The police asked Curell to ask petitioner about the case, and thus the conversation appeared to be a secret interrogation. *Cf. Kuhlmann v. Wilson*, 477 U.S. 436, 458-59 (1986). The trial court's orders were consistent with those decisions of the Supreme Court. Statements by petitioner about the murder case to Curell after Curell started to work with the police, and in response to Curell's police-requested questions, were inadmissible. Statements by petitioner about the murder case before Curell started to work with the police were admissible. Statements by petitioner about bribing Curell to provide an alibi were admissible because formal criminal proceedings for the attempted bribery had not yet commenced, and petitioner's Sixth Amendment right to have counsel present at interrogations was specific to the charge of murder. *Texas v. Cobb*, 532 U.S. 162 (2001); *McNeil v. Wisconsin*, 501 U.S. 171 (1991). Defense counsel could waive the matter, as the trial court also noted.

At trial, the prosecution played at least part of the recording of the January 25, 1993, meeting between Curell and petitioner. The recording was not transcribed. Exh. A, at 2626-27 (dkt. no. 154). Petitioner claims that the recording contained statements by him about the murder case. For the purposes of this order, the Court will assume that petitioner is correct. The Nevada Supreme Court rejected this claim summarily on direct appeal. *Phenix*, 954 P.2d at 741.

Respondents argue that petitioner opened the door when counsel asked witness Robert Schaefer on cross-examination whether Schaefer knew about petitioner's attempt to bribe Curell. Petitioner argues that the prosecution brought up the objectionable material first in the opening statements. Neither argument is persuasive.

Respondents' argument ignores the distinction between petitioner's two criminal cases. Petitioner's statements to Curell about the murder after Curell started working with the police were inadmissible unless defense counsel opened the door. Counsel asked Schaefer about the attempted bribery, not the murder. That question did not open the door to admitting petitioner's recorded statements to Curell about the murder.

Petitioner's argument also ignores the distinction between the two criminal cases. Regarding petitioner and Curell, the prosecution said in its opening statement:

> The evidence will show that although Mr. Phenix was down there [the Showboat] before and he was down at the Showboat afterwards [referring to the time of Mrs. Phenix's murder] that there was a window of opportunity.
>
> And the evidence is also going to suggest that Mr. Phenix knew that and so he got in touch with his friend, Robert Curell, whom he had known from the fast food restaurant.
>
> And they had various conversations. They met at the Taco Bell where Mr. Curell was employed at the time. They met at his place at his mother's house, and one thing led to another and then Mr. Phenix was propositioning Mr. Curell.
>
> He was explaining he needed an alibi, and he was explaining when he needed the alibi.
>
> And he also was offering a financial benefit. Mr. Curell really wanted to make a down payment on a house, and he was offered up to $10,000.00 if he would provide an alibi for Mr. Phenix.

1
2
3

Robert Curell will be called as a witness.  He will make it very clear he didn't have the foggiest idea where Raymond Phenix was the evening of November the 14th, 1991.  He hadn't been to the Showboat Hotel that evening, he had no idea whether Mr. Phenix was there or wasn't there.

4
5
6

He only knew that the man in these meetings was giving him a script.  And so at some point he contacted the police department.  And the evidence will indicate that this was a month or so after this started to happen and he could see it was getting out of hand and he called and he gave a statement and he agreed to be wired.

7
8
9
10

<u>And then there was a subsequent meeting the following Monday where he met with the defendant and was physically given a page on which information was contained about which he was to testify.  And there was more conversation about what monies he would be paid and he will be testify [sic] that the story was rehearsed, that Mr. Phenix even went through a simulation of what types of questions he would be asked on the witness stand.</u>

11   Exh. A, at 587-89 (dkt. no. 154-2) (emphasis added).  The emphasized paragraph refers

12   to the recorded conversation on January 25, 1991.  The prosecution does refer to the

13   discussion between Curell and petitioner about the attempted bribery and how Curell

14   would testify at trial.  The prosecution does not refer to any questions by Curell, or

15   answers by petitioner, about the murder case.  The opening statement did not allude to

16   any inadmissible evidence and was not misconduct.

17       Having set aside both parties' arguments, the Court finds that the Nevada

18   Supreme Court's summary disposal was reasonable.  In petitioner's opening statement,

19   counsel said:

20
21
22
23

The evidence will show that after Mr. Phenix was arrested [for the murder of Mrs. Phenix] he does certain acts which the State is eventually going to argue are not consistent with innocence and that is he approaches Robert Curell and attempts to enlist him as an individual to testify on his behalf as having been present at the Showboat Hotel.  In effect, he attempts to bribe him.

24
25
26

You will learn that this is done approximately four months prior to the trial which was to have occurred in 1993.  You will hear that Mr. Curell, not in the beginning, but eventually went to the police and that when Mr. Curell went to the police the police asked if he would wear what's going to be referred to as a wire or a monitor.  And that two conversations with Mr. Phenix was recorded.

27
28

<u>You will hear that specific recording of that first conversation.  By this point in time the police, the evidence will show, have directed Mr. Curell to ask Mr. Phenix certain questions and this tape is going to be played for you.</u>

1

> One of the questions they have directed that he ask is whether or not he killed his wife, and the evidence will show that Mr. Phenix consistently says that he did not kill his wife.

2

3

> You will hear from a Detective Scholl the reaction of Mr. Phenix when he gets arrested on this attempt bribery situation of Mr. Curell and what he specifically says and what he says being consistent with an innocent person that is panicked.

4

5   Exh. A, at 623-24 (dkt. no. 154) (emphasis added).  Defense counsel not only referred

6   to the recorded conversation, but also mentioned that the police asked Curell to ask

7   petitioner questions about the murder.  Defense counsel wanted the recording admitted

8   to get petitioner's denials into the record, possibly because this method would not

9   expose petitioner to cross-examination.[10]   The Nevada Supreme Court, reviewing the

10   record, reasonably could have determined that the prosecution committed no

11   misconduct and that defense counsel waived any Sixth Amendment issue.  Ground 3 is

12   without merit.

13        Jurists of reason might debate whether petitioner opened the door to admission

14   of his recorded statements, and the Court will grant a certificate of appealability on

15   ground 3.

16   **VII.    GROUNDS DISMISSED EARLIER**

17        The Court dismissed two grounds of the second amended petition (dkt. no. 17)

18   because petitioner had not exhausted his available state-court remedies and because

19   petitioner indicated that he would drop the grounds if the Court found a lack of

20   exhaustion. Order, at 2-3 (dkt. no. 42). Ground 8(I) was a claim that petitioner's

21   appellate counsel provided ineffective assistance because she did not give petitioner his

22   case files.  The Court found that petitioner never presented those facts to the state

23   courts.  Ground 10 was a claim of two errors in the state habeas corpus proceedings.

24   This Court ruled that petitioner presented those claims to the Nevada Supreme Court in

25   mandamus petitions, which are not methods by which the Nevada Supreme Court was

26   likely to rule on the merits.  Reasonable jurists would not find these conclusions to be

27

28   _____
[10]Ground 3 is not a claim of ineffective assistance of counsel, and the Court will not review counsel's decision.

debatable or wrong, and the Court will not issue a certificate of appealability for the grounds dismissed as unexhausted.

The Court dismissed five grounds as procedurally defaulted. The Court determined that petitioner had not shown cause to excuse the procedural default of grounds 4, 5, 6, 7(V), and 11 of the second amended petition (dkt. no. 17).  Order, at 4-7 (dkt. no. 42).  Reasonable jurists would not find these conclusions to be debatable or wrong, and the Court will not issue a certificate of appealability for the grounds dismissed as procedurally defaulted.

Ground 9 of the second amended petition was a claim of actual innocence.  The Court noted that a free-standing claim of actual innocence is not addressable in federal habeas corpus.  The Court also ruled that if it was to construe ground 9 as a claim that insufficient evidence existed to support the verdict, then the claim was procedurally defaulted, and petitioner failed to show actual innocence to excuse the procedural default.  Reasonable jurists would not find these conclusions to be debatable or wrong, and the Court will not issue a certificate of appealability for the dismissal of ground 9 of the second amended petition.

Pending on the Court's docket is a petition for a writ of mandamus (dkt. no. 175), which is denied as moot as the Ninth Circuit Court of Appeals has ruled on this petition.

## VIII.  CONCLUSION

IT IS THEREFORE ORDERED that the Clerk of the Court shall file the fourth amended petition, which is attached to the motion for leave to file a fourth amended petition (dkt. no. 147).

IT IS FURTHER ORDERED that the fourth amended petition is DENIED.  The Clerk of the Court shall enter judgment accordingly.

IT IS FURTHER ORDERED that a certificate of appealability is DENIED as to grounds 1 and 2 and is GRANTED as to ground 3 on whether the Court was correct in its determination that the prosecution committed no misconduct by admitting petitioner's statements recorded in secret after petitioner was charged with murder.

1    IT IS FURTHER ORDERED that the petition for a writ of mandamus (dkt. no.

2    175) is DENIED as moot.

3    IT IS FURTHER ORDERED that petitioner's Ex Parte Motion for a Status Check

4    (dkt. no. 179) is DENIED as moot.

5

6    DATED THIS  24th day of July 2013.

7

8    _____

9    MIRANDA M. DU
     UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28